IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEAN J. KAPLAN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO. 19-5099 |
| Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                             July 24, 2020

Sean J. Kaplan ("Plaintiff") seeks review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's decision denying his claim for disability insurance benefits ("DIB"). For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") denying benefits is not supported by substantial evidence and will remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**I.    PROCEDURAL HISTORY**

Plaintiff applied for DIB on September 2, 2016, claiming that he became disabled on February 25, 2016, due to Parkinson's disease, ulcerative colitis, and chronic back pain. Tr. at 77-78, 88, 179, 204. The application was denied initially, id. 89-93, and Plaintiff requested an administrative hearing before an ALJ, id. at 96-97, which took place on August 13, 2018. Id. at 38-75. On November 20, 2018, the ALJ found that

---

[1]In his Complaint, Plaintiff named the "Commissioner of Social Security" as the defendant in this case. Andrew Saul became the Commissioner of Social Security ("Commissioner") on June 17, 2019, prior to the filing of Plaintiff's Complaint, and is properly named as the defendant in this action. F.R. Civ. P. 25(d).

Plaintiff was not disabled.  Id. at 15-31.  The Appeals Council denied Plaintiff's request for review on September 18, 2019, id. at 1-3, making the ALJ's November 20, 2018 decision the final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on October 30, 2019.  Doc. 1.  The matter is now fully briefed and ripe for review.  Docs. 8, 9.[2]

## II.  LEGAL STANDARD

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantially gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments" ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

---

[2]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Docs. 2, 4.

> 5. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 404.1520(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled and is capable of performing jobs that exist in significant numbers in the national economy. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

### III.  DISCUSSION

#### A.  ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff suffered from several severe impairments at the second step of the sequential evaluation; depression, Parkinson's disease, and lumbar

radiculopathy. Tr. at 17. The ALJ next found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id. at 18, and that Plaintiff retained the RFC to perform a limited range of light work, finding that he can climb ramps and stairs frequently, and ladders, ropes, or scaffolds occasionally; balance, stoop, kneel, and crouch frequently, and crawl occasionally; never work at unprotected heights, operate moving mechanical parts; occasionally operate a motor vehicle; and have no concentrated exposure to vibration. Id. at 21. Additionally, the ALJ found Plaintiff is limited to simple, routine, and repetitive tasks, but not at a production rate pace, and is limited to making simple work-related decisions. Id. At the fourth step of the evaluation, the ALJ found that Plaintiff could not return to his past relevant work as a manager, manager report analyst, or financial planner. Id. at 30. However, the ALJ found, based on the testimony of a vocational expert ("VE"), that Plaintiff could perform work that exists in significant numbers in the national economy including jobs as a mail clerk, cashier, or retail marker. Id. at 30-31.

Plaintiff claims that the ALJ failed to properly consider the opinions of his neurologist, his psychologist, and an independent consultative examiner, and failed to consider Plaintiff's subjective complaints or his exemplary work history in assessing his testimony. Doc. 8 at 4-30. Defendant responds that the ALJ properly considered the medical opinions and Plaintiff's subjective complaints. Doc. 9 at 3-13.

B.     **Summary of Medical Evidence**

Plaintiff was diagnosed with early-onset Parkinson's disease[3] in 2008, tr. at 606, 660, and has treated with neurologist Tsao-Wei Liang, M.D., at Thomas Jefferson since 2014.  Id. at 600.  In February 2016, Dr. Liang noted that Plaintiff continued taking Stalevo 150, the effects of which could last 4 hours or not at all, and that he was doing better on Rytary.[4]  Id. at 391.  The doctor noted Plaintiff's balance was good, but he was experiencing more bradykinesia.[5]  Id.  Dr. Liang also noted that Plaintiff's Parkinson's

---

[3]     Parkinson's disease is a progressive nervous system disorder that affects movement. Symptoms start gradually, sometimes starting with a barely noticeable tremor in just one hand.  Tremors are common, but the disorder commonly causes stiffness, or slowing of movement.
       In the early stages of Parkinson's disease, your face may show little or no expression.  Your arms may not swing when you walk.  Your speech may become soft or slurred.  Parkinson's disease symptoms worsen as your condition progresses over time.

See https://www.mayoclinic.org/diseases-conditions/parkinsons-disease/symptoms-causes/syc-20376055#:~:text=Parkinson's%20disease%20is%20a%20progressive,stiffness%20or%20slowing%20of%20movement. (last visited July 2, 2020).

[4]The record indicates that Plaintiff's insurance denied coverage for Rytary at that time and Dr. Liang wrote a letter of medical necessity to urge coverage.  Tr. at 395. Stalevo 150 is a combination of carbidopa, entacapone, and levodopa, used to treat Parkinson's symptoms, including muscle stiffness, tremors, spasms, and poor muscle control.  See https://www.drugs.com/mtm/stalevo-150.html (last visited June 26, 2020). Rytary is an extended release form of carbidopa and levodopa used to treat Parkinson's symptoms.  See https://www.drugs.com/cdi/rytary.html (last visited June 26, 2020).

[5]"Bradykinesia means slowness of movement and is one of the cardinal manifestations of Parkinson's disease."  See https://pubmed.ncbi.nlm.nih.gov/11673316/ (last visited June 26, 2020).

disease was complicated by "wearing-off, fatigue." Id. at 393.[6]  The doctor continued Plaintiff's prescriptions for Mirapex and Azilect, and Klonopin.[7] Id.  In December 2016, the doctor noted that Plaintiff showed minimal dyskinesia and minimal rigidity and bradykinesia.  Id. at 874.  The doctor noted that Plaintiff's Parkinson's disease was complicated by "wearing off, stiffness, dystonia,[8] and depression," and specifically noted that Plaintiff was "50% ON and 50% OFF" with unpredictable wearing off.[9]  Id. at 873-74.  Incorporated into the doctor's notes was the Unified Parkinson's Disease Rating Scale ("UPDRS"), "a rating tool used to gauge the course of Parkinson's disease in

---

[6]"Wearing off" is a phenomenon related to the use of levodopa. Levodopa is currently the most effective treatment for Parkinson's disease . . . ; however, long-term levodopa therapy often results in motor complications, such as motor fluctuations and dyskinesia [involuntary muscle movements]. The initial complication is commonly wearing-off, which is the reemergence of motor and non-motor symptoms before the next scheduled levodopa dose.
See https://pubmed.ncbi.nlm.nih.gov/19228103/ (last visited June 26, 2020).

[7]Mirapex has the same effects on the body as naturally produced dopamine, low levels of which are associated with Parkinson's disease.  Mirapex is used to treat stiffness, tremors, muscle spasms, and poor muscle control related to Parkinson's disease.  See https://www.drugs.com/mirapex.html (last visited June 26, 2020).  Azilect is used to treat symptoms of Parkinson's disease.  See https://www.drugs.com/azilect.html (last visited June 26, 2020).  Klonopin is a benzodiazepine used to treat seizure disorders and panic disorder.  See https://www.drugs.com/klonopin.html (last visited June 26, 2020).

[8]"Dystonia is a movement disorder in which your muscles contract involuntarily, causing repetitive or twisting movements."  See https://www.mayoclinic.org/diseases-conditions/dystonia/symptoms-causes/syc-20350480 (last visited July 2, 2020).

[9]"On" and "off" can refer to periods when the Parkinson's symptoms are being managed by medication versus not being managed due to wearing off or other reasons.  See https://www.webmd.com/parkinsons-disease/motor-fluctuations (last visited July 23, 2020).

patients." See https://www.theracycle.com/resources/links-and-additional-resources/updrs-scale/ (last visited July 2, 2020).[10]

During an examination on September 11, 2017, Dr. Liang noted that Plaintiff was "ON 67 vs OFF 33[,] OFF severe and feels robotic, sudden offs." Tr. at 849. On examination Plaintiff showed minimal dyskinesia, mild/moderate bradykinesia and rigidity left greater than right, and normal gait and reflexes. Id. at 850. Again, the doctor noted that Plaintiff's condition was complicated by wearing-off, stiffness, dystonia, depression and insomnia. Id. The doctor continued Plaintiff on Stalevo 200 and Mirapex, considered using Rytary at bedtime, "Apokyn injection for rescue if nighttime symptoms prove to a wearing off phenomena," Sinemet for nighttime restlessness or insomnia, and Azilect if needed.[11] Id. On February 22, 2018, Dr. Liang noted that

---

[10]Dr. Liang attached section three of the UPDRS, addressing the motor examination, which assesses speech, facial expression, tremor at rest, action or postural tremor of hands, rigidity, finger taps, hand movements, rapid alternating movements of the hand, leg agility, arising from chair, posture, gait, postural stability, and body bradykinesia. The doctor indicated that it was an "ON" exam, and Plaintiff exhibited moderate impairment in his ability to tap his thumb and forefinger together on both hands, mild slowing of his hand grip on the right hand, mild slowing of pronation and supination of the right hand, moderate impairment of pronation and supination of the left hand, similar impairment of toe tapping on both the right and left side, mild slowing of right leg agility, mild rigidity in the left upper extremity, and a slow shuffling gait. Tr. at 874-75; see also https://www.theracycle.com/resources/links-and-additional-resources/updrs-scale/ (last visited July 2, 2020).

[11]Apokyn has the same effects as dopamine and is used to treat "wearing off" episodes (muscle stiffness, loss of muscle control) in people with advanced Parkinson's disease. See https://www.drugs.com/apokyn.html (last visited June 29, 2020). Sinemet contains a combination of carbidopa and levodopa, used to treat symptoms of Parkinson's disease including muscle stiffness, tremors, spasms and poor muscle control. See https://www.drugs.com/mtm/sinemet.html (last visited June 29, 2020)

Plaintiff is "ON for around 2/3-3/4 of the day," his Stalevo was lasting about three hours, but that he can turn "OFF suddenly, at which time [he] would either take early or take 1 Sinemet." Id. at 853. The doctor noted "minimal dyskinesia" on exam, with "[m]ild-moderate bradykinesia and rigidity [left greater than right]." Id. at 854. On May 7, 2018, Dr. Liang added a Neupro patch for akathisia, wearing off, and dystonia.[12] Id. at 886. The doctor noted that Plaintiff was "ON for around 2/3-3/4 of the day," but can turn OFF suddenly. Id. at 884.[13]

Dr. Liang has completed several forms certifying Plaintiff's disability for private group disability insurance purposes and in support of his claim for DIB. See tr. at 414-16 (6/16/16 – private), 417-18 (6/29/16 – private), 600-03 (9/29/16 – Medical Assessment Form), 901-04 (9/1/18 – Medical Assessment Form). In the most recent assessment, the doctor noted that Plaintiff suffers from tremors, rigidity, bradykinesia, saliva drooling, impaired gait, chronic fatigue, impaired attention and concentration, and soft/poorly modulated voice as a result of his Parkinson's disease. Id. at 901. The doctor opined that Plaintiff could sit for 15 minutes at a time for a total of about 4 hours in a workday and could stand for 10 minutes at a time for less than 2 hours in a workday. Id. at 902.

---

[12] Neupro is used to treat Parkinson's disease and restless leg syndrome. See https://www.drugs.com/cdi/neupro.html (last visited July 2, 2020). Akathisia refers to a feeling of restlessness or inability to be still. See https://www.parkinson.org/Understanding-Parkinsons/Symptoms/Non-Movement-Symptoms/Pain (last visited July 2, 2020).

[13] In the notes for each of these evaluations, Dr. Liang incorporated section three of the UPDRS, indicating mild or moderate symptoms during his motor examination. Each of the UPDRS forms indicates that the exam was conducted during an "ON" period. Tr. at 850-51 (9/11/17), 855-56 (2/20/18), 886-87 (5/7/18).

Additionally, the doctor opined that Plaintiff would require more than 10 unscheduled 20-minute breaks during the day due to his symptoms. Id. Dr. Liang stated that Plaintiff could rarely lift 10 pounds, twist or stoop, and that tremors, bradykinesia, rigidity, and fine motor impairments would hinder the use of his upper extremities. Id. at 903.

Plaintiff also has a history of ulcerative colitis dating to at least 2006. Tr. at 734.[14] During the relevant time, Plaintiff treated with Joseph Hacker III, M.D., for ulcerative colitis, id. at 366-72, which is well controlled on Humira.[15] Id. at 53, 366.

Plaintiff has a history of L4-L5 laminectomy in 1987, and suffers from low back pain for which he sees Scott T. Roberts, M.D., at Christiana Spine Center. Tr. at 391, 452-54, 476. In February 2016, Dr. Roberts noted that Plaintiff's lower back pain radiated into his left buttock, but not into the leg. Id. at 479. The doctor noted that Plaintiff's lumbar range of motion on extension and flexion was decreased by 25%, but he had full strength in his lower extremities. Id. at 480. Dr. Roberts performed a series of injections in the first half of 2016. Id. at 496 (2/26/16 - left L5 selective nerve root block/corticosteroid injection), 533 (5/11/16 – left L3, L4, and L5 medial branch blocks for diagnostic blockade of the left L4-L5 and L5-S1 facet joints), 559 (5/13/16 – left L5

---

[14]Other conditions for which Plaintiff was treated prior to his alleged onset date include squamous cell cancer in 2012 and shingles (herpes zoster) of the trigeminal nerve in 2015. Tr. at 324, 731.

[15]Humira is a tumor necrosis factor blocker that reduces the effects of substances in the body that cause inflammation and is used to treat ulcerative colitis, rheumatoid arthritis, psoriatic arthritis, and others. See https://www.drugs.com/humira.html (last visited June 29, 2020).

selective nerve root block/corticosteroid injection).  Plaintiff reported 60% improvement about 10 weeks after the first injection.  Id. at 526.

In November 2016, Plaintiff began treating for left shoulder pain with Michael Pushkarewicz, M.D., at First State Orthopaedics, who performed a left shoulder bursa injection, which provided about 20% relief.  Tr. at 666, 668.  After an MRI, Dr. Pushkarewicz diagnosed Plaintiff with tendinopathy and partial thickness intrasubstance tearing of the subscapularis.  Id. at 669.  The doctor prescribed physical therapy and recommended that Plaintiff check with his other providers to see if a topical cream could be used for the pain.  Id.  The doctor performed subsequent injections on February 23 and April 6, 2017.  Id. at 671, 673.

In addition to Dr. Liang's questionnaires, on March 9, 2017, neurologist Philip A. Adelman, M.D., conducted an independent medical evaluation, during which the doctor noted Plaintiff had soft hypophonic voice with occasional slurring, moderate masking of facial expression, moderate bradykinesia, and mild action tremor.  Tr. at 660, 662.  Dr. Adelman found that Plaintiff had good power in his limbs, but difficulty with handwriting, which also showed a tremor.  Id.  Plaintiff had motor fluctuations including on/off and wearing off phenomena, slowness of movement, difficulty walking, tremor, trouble with dexterity, and fatigue.  Id.

Plaintiff began treating with Roseanne D. Dobkin, Ph.D., on October 20, 2016, for depression, anxiety, and coping with a chronic medical condition.  Tr. at 857.  Dr. Dobkin found Plaintiff's memory, attention, and concentration impaired and his mood depressed.  Id. at 858.  She diagnosed Plaintiff with major depressive disorder

("MDD").[16]  Id.  Plaintiff continued treating with Dr. Dobkin twice a month for three months and then monthly in January and February 2017, and sporadically thereafter.  Id. at 857-68.  On December 20, 2016, Dr. Dobkin completed a Mental Impairment Questionnaire, indicating that Plaintiff was unable to return to work and would continue to progress and worsen over time, and had a Global Assessment of Functioning ("GAF") score of 60.[17]  Id. at 647.  With respect to Plaintiff's abilities to perform unskilled work, the doctor found that Plaintiff had limited ability to ask simple questions or request assistance.  Id. at 649.  In all other abilities, Dr. Dobkin found Plaintiff was seriously limited, unable to meet competitive standards, or had no ability to function.  Id.  With respect to the ability to perform semiskilled and skilled work, the doctor found Plaintiff unable to meet competitive standards in all areas.  Id. at 650.

---

[16]The essential feature of MDD is a clinical course that is characterized by one or more major depressive episodes.  Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM-5"), at 160-61.  A major depressive episode is a period of at least two weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities.  Id. at 163.

[17]A GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000), at 34.  A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id.  Although the fifth edition of the DSM eliminated reference to the GAF score, the Commissioner continues to receive and consider GAF scores in medical evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case file.  Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016)).

Dr. Liang referred Plaintiff for a neuropsychological evaluation, which Joseph Tracy, Ph.D., conducted on October 18, 2016.  Tr. at 606-11.  After his examination and administering a series of tests, Dr. Tracy concluded that Plaintiff's neurocognitive status was intact and his concerns were psychiatric, noting the presence of dysthymia, somatization and anxiety.  Id. at 610.  Dr. Tracy saw no psychiatric or neurocognitive issues that precluded Plaintiff's functioning at work, but left the decision about Parkinson's related symptoms affecting his work to Plaintiff's neurologist.  Id.

In January 2017, at the initial consideration stage, Candelaria Legaspi, M.D., reviewed the record and determined that Plaintiff was capable of light work, with the ability to stand/walk for 6 hours and sit for 6 hours in a workday, and no limitations on handling, fingering, or feeling or overhead reaching with his right hand.  Tr. at 83-84.  Alex Siegel, Ph.D., also reviewed the record at the initial consideration stage, finding that Plaintiff suffered from depressive, bipolar, and related disorders, but had only mild limitations in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  Id. at 81.

### C.  Other Evidence

Plaintiff was born on March 18, 1968.  Tr. at 179.  He completed college and worked as an analyst for Chase Manhattan Bank beginning in 2001.  Id. at 47, 205.  Plaintiff explained that for several years after his Parkinson's diagnosis in 2008, he experienced limited impact on his work ability, but when "[he] got near the eight-year mark, [he] was working from home full time and delegating more of [his] responsibilities to the people under [him]."  Id. at 49, 59.  He left his job on February 26, 2016.  Id. at 46.

Plaintiff complained that he rarely gets a good night's sleep because he has to take additional medication in the middle of the night. Tr. at 51-52. Among other physical manifestations, Parkinson's disease also has affected his digestive system, causing constipation, frequency, and urgency. Id. at 53. It has also affected his manual dexterity, causing difficulty with his hands, including writing, dialing a phone, using a keyboard, and using buttons and zippers. Id. at 54, 60. In addition, Plaintiff testified that his "cognitive function is not the same in terms of just being able to express [himself] or interact with people the way [he] used to." Id. at 54. He also has difficulty projecting and speaking. Id. at 55. Depending on the day, Plaintiff estimated that he could sit for 20 minutes to an hour. Id. at 61-62.

Plaintiff also testified that he has difficulty walking at times. Tr. at 63. He described on and off periods for his medication. When it "kicks in, . . . it addresses [his] symptoms [and] he can walk pretty well," but when it wears off, his symptoms become more pronounced and he gets stiff and slow. Id. Plaintiff lies flat and elevates his legs frequently during the day. Id. at 65. Plaintiff submitted a letter and synopsis of a typical 24-hour period in his life, explaining his activities and how they are affected by his on and off periods when his medication is suppressing his Parkinson's symptoms and when it is not. Id. at 296-97.

Plaintiff's wife completed a Function Report in which she corroborated much of the Plaintiff's testimony. Tr. at 236. She said that he was unable to sit for more than an hour, has difficulty with fine motor skills, his speech is soft and slurred, he has trouble

with concentration and focus, stress exacerbates his symptoms, and his "on/off periods" with his medications "can make simple tasks impossible." Id.

### D. Consideration of Plaintiff's Claims

Plaintiff contends that the ALJ failed to properly consider the opinion evidence offered by Drs. Liang, Dobkin, and Adelman, and also failed to properly consider Plaintiff's subjective complaints. Doc. 8 at 4-30. Defendant responds that the ALJ properly evaluated the opinion evidence and Plaintiff's complaints. Doc. 9 at 3-13. Because I conclude that the ALJ's decision exhibits a fundamental misunderstanding of the medical record which impacted the ALJ's consideration of both Plaintiff's testimony concerning his limitations and the medical opinion evidence, I will address the claims together. Further, because I conclude that the ALJ's RFC assessment did not include all of the medically supported and credibly established limitations, I will remand the case for further consideration.

The RFC is the most a claimant can do despite his limitations. 20 C.F.R. § 404.1545(a)(3). In assessing a claimant's RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, including those that are not severe. Id. § 404.1545(a)(2). "ALJ's are not required to include every alleged limitation in their hypotheticals and RFC assessments; their responsibility is to 'accurately convey' only '<u>credibly established limitations</u>" which are 'medically supported and otherwise uncontroverted in the record.'" Arlow v. Colvin, Civ. No. 13-99, 2014 WL 1317606, at *5 (W.D. Pa. March 28, 2014) (emphasis in original) (quoting Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2003)). "In making the [RFC] determination, the ALJ must

consider all evidence before [her]." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).

With respect to medical opinion evidence, generally, the governing regulations dictate that an ALJ must give medical opinions the weight she deems appropriate based on factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the record as a whole. 20 C.F.R. § 404.1527(c).[18] "The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)). An ALJ may afford a medical opinion "more or less weight depending on the extent to which supporting explanations are provided. Id. (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985)). Additionally, "the more consistent a medical opinion is with the record as a whole, the more weight" it will be given. 20 C.F.R. § 404.1527(c)(4). "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Id. (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

In assessing a claimant's subjective complaints of pain and other symptoms, the governing regulations require the ALJ to consider, among other things, the type, dosage,

---

[18]Effective March 27, 2017, the Social Security Administration amended the rules regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). Because Plaintiff's application was filed prior to the effective date of the new regulations, the opinion-weighing paradigm is applicable.

effectiveness, and side effects of any medications a claimant takes to control those symptoms. 20 C.F.R. § 404.1529(c)(3)(iv). In addition, the ALJ will consider "an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities . . . ." S.S.R. 16-3p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims," 2016 WL 1119029, at *8 (March 16, 2016).

Here, Plaintiff makes several arguments regarding the ALJ's consideration of the medical opinion evidence and Plaintiff's testimony, including the consistency of opinions from two treating physicians and a consultative examiner, the ALJ's favoring non-examining physicians over long-time treating physicians, and the ALJ's failure to address the Parkinson's on/off phenomenon from which Plaintiff suffers. Doc. 8 at 16-28. Review of the ALJ's decision, in light of the medical evidence in the record reveals the ALJ's fundamental misunderstanding of the treatment notes and a misinterpretation of the medical record.

This error is exemplified by the ALJ's interpretation of a notation on the first page of Dr. Liang's records as they appear in the administrative record. The doctor wrote:

> 80-90% ON
> OFF occurs, severe and disabling

Tr. at 391. The ALJ referenced this notation repeatedly in her opinion, as will be discussed, interpreting it to mean that "[w]hen [Plaintiff] is medication compliant, he functions at 80% to 90%. Id. at 23, 25 (citing [tr. at 391]). Thus, the ALJ interpreted Dr. Liang's medical record as indicating that Plaintiff operated at near full capacity when he

was "compliant" with his medications, and repeatedly relied on this interpretation in fashioning the RFC.

The ALJ's interpretation overlooks the evidence in the record that Plaintiff suffers from a wearing off phenomenon, and that and Dr. Liang was describing the period of time that Plaintiff's Parkinson's medication is effective in diminishing his symptoms versus the period of time that he suffers with symptoms prior to his next dose of medication. See, e.g., id. at 606 (10/18/16 – Dr. Tracy – "He does experience an on-off phenomenon with his medications. The motor symptoms particularly left arm coordination problems and stiffness increase rapidly when his dopamine levels drop."), 660 (3/9/17 – Dr. Adelman – "He has 'off time' when medications are insufficiently effective. At such times he has a softer voice, increased tremors in the upper extremities, and diminished ability to function, such as writing or typing, which would be extremely slowed."), 874 (12/5/16 - "On exam minimal dyskinesia," "Stage 2 – Parkinson's Disease complicated by wearing off, stiffness, dystonia, and depression"), 884 (5/7/18 - "Estimates that he is ON for around 2/3-3/4 of the day. His stalevo is lasting around 3 hours, taking around 20-30 minutes to kick in. Can turn OFF suddenly . . . ."), 904 (6/1/18 - "The patient suffers from Stage 2-2.5 . . . Parkinson's Disease . . . notable for medication wearing off/motor fluctuations, dystonia, akathisia, depression, stiffness/rigidity, bradykinesia, and tremor.").[19] Review of the record reveals that Plaintiff's "Off Time" fluctuated with time depending on the changes in his medications.

---

[19] Unless otherwise noted, these citations are to Dr. Liang's treatment notes.

Id. at 391 (6/7/16 – "80-90% ON"), 873 (12/18/16 – "50% ON 50% OFF"), 843 (4/3/17 – "ON 75 vs OFF 25%"), 849 (9/11/17 – "ON 67 vs OFF 33"), 853 (2/22/18 – "ON for around 2/3-3/4 of the day"), 884 (5/7/18 – "ON for around 2/3-3/4 of the day").

Although Plaintiff complains that the ALJ did not address the on/off phenomenon, Doc. 8 at 27, the ALJ's error was far worse because she misinterpreted Dr. Liang's notes regarding the on/off phenomenon as indicating that Plaintiff was noncompliant with prescribed treatment. This misinterpretation infected much of the ALJ's analysis. For example, the ALJ relied on Plaintiff's alleged noncompliance with his prescribed drug regimen when considering Plaintiff's testimony about his symptoms and the limiting effects of his impairments.

> As for [Plaintiff's] statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because [Plaintiff] has alleged fatigue, but as previously stated when [Plaintiff] is complaint with his Parkinson's medications, he is 80% to 90% functional. Furthermore, Dr. Liang, [Plaintiff's] neurologist, has stated that when [Plaintiff] is off of his medications that he has increased fatigue, as well as difficulty sitting, typing on the computer, and difficulty with concentrating and memory. Hence, the undersigned notes that this is a question of medication compliance.

Tr. at 25. The ALJ is incorrect. Dr. Liang's notes do not evidence Plaintiff's non-compliance with his medication regimen. Rather, Dr. Liang's notes indicate that Plaintiff's Parkinson's medication was effective only 80% - 90% of the time in June 2016, and the efficacy reduced over time. Thus, the ALJ's consideration of Plaintiff's testimony was flawed.

The ALJ repeated this error in considering the medical opinion evidence. For example, the ALJ stated that he gave little weight to Dr. Adelman's opinion in part because it was inconsistent with Dr. Liang's notation that "[w]hen the claimant is medication compliant, he functions at 80% to 90%." Tr. at 29 (citing id. at 391).[20] Moreover, the ALJ relied on Dr. Liang's physical exam findings to limit the weight he gave to both Dr. Liang's opinions and those of Dr. Adelman, noting that Dr. Liang's examination record dated April 2017 revealed minimal dyskinesia, no tremor and minimal rigidity and bradykinesias. Id. at 29 (citing id. at 843). The problem is that Dr. Liang specifically noted that this exam was an "ON exam." Id. at 843. Read in the context of the entire record, Dr. Liang found that during the period when Plaintiff's Parkinson's medication was effective, he still exhibited minimal dyskinesia, no tremor, and minimal rigidity and bradykinesia. Id. The doctor noted at that point that Plaintiff took Stalevo every 3 to 4 hours and it was effective 75% of the time. Id. The ALJ ignores the fact that 25% of the time, Plaintiff's symptoms were not controlled by the medications he was prescribed. Similarly, Dr. Adelman noted that his assessment was based on the variability of Plaintiff's Parkinson's symptoms and the "off time" during which "his medications do not provide sufficient benefit for him to be well functional." Id. at 665.

---

[20] Although the ALJ actually quoted Dr. Adelman's explanation of the variability of Plaintiff's symptoms due to "off time," she clearly did not understand the import of the explanation. Tr. at 29 (quoting id. at 665).

The ALJ failed to consider the limitations presented by the on/off phenomenon associated with Plaintiff's Parkinson's medication, and misconstrued the doctor's notations as Plaintiff's noncompliance with his medication regimen.  In short, the RFC assessment does account for Plaintiff's "off time," and the limitations he suffered during the "off time."  Thus, the ALJ's RFC assessment is not supported by substantial evidence.[21]

## IV.    CONCLUSION

The ALJ's consideration of the medical evidence was flawed and the ALJ's misinterpretation of the evidence permeated his consideration of the medical opinion evidence and Plaintiff's testimony, and resulted in an inadequate RFC assessment.  On remand, the ALJ shall reconsider the medical evidence, contact Plaintiff's treating neurologist for clarification, if necessary, reconsider Plaintiff's testimony in light of the medical evidence, and obtain additional vocational evidence after reconsidering Plaintiff's RFC.

An appropriate Order follows.

---

[21] Because the ALJ's misconstruction of the medical evidence may impact the weight given to treating psychologist Dr. Dobkin's assessments, the ALJ should reconsider the mental health treatment evidence as well.